# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| **JOSEPH T. GENTLEMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 16 C 3096** |
| | ) | |
| | ) | **Judge Joan B. Gottschall** |
| **MASSACHUSETTS HIGHER** | ) | |
| **EDUCATION ASSISTANCE** | ) | |
| **CORPORATION d/b/a AMERCIAN** | ) | |
| **STUDENT ASSISTANCE, a** | ) | |
| **Massachusetts not for profit corporation,** | ) | |
| **DELTA MANAGEMENT ASSOCIATES,** | ) | |
| **INC, a Massachusetts corporation,** | ) | |
| **GLOBAL RECEIVABLES SOLUTIONS,** | ) | |
| **INC., f/k/a  WEST ASSET** | ) | |
| **MANAGEMENT, INC., a Delaware** | ) | |
| **Corporation, and ACS EDUCATION** | ) | |
| **SERVICES, a New York Corporation,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Joseph Gentleman ("Gentleman") has filed a complaint alleging a number of statutory and common-law claims against defendants Massachusetts Higher Education Assistance Corporation d/b/a American Student Assistance ("ASA"); Delta Management Associates, Inc. ("Delta"); Global Receivables Solutions, Inc., f/k/a West Asset Management, Inc. ("GRS"); and ACS Education Services ("ACS"). The claims arise in connection with the defendants' attempts to collect payment on a student loan that Gentleman consolidated in 2006.

Each of the defendants has separately moved to dismiss the complaint on various grounds.[1] For the reasons discussed below, ASA's, GRS's, and Delta's motions are granted in part and denied in part; and ACS's motion is granted in its entirety.

**BACKGROUND**[2]

From 1996 through 1998, Gentleman took out a number of student loans to cover educational expenses. The loans were obtained from private lenders pursuant to the Federal Family Education Loan Program ("FFELP" or "the Program"). 20 U.S.C. §§ 1071 to 1087–4. The Program, which has since been discontinued,[3] was "a system of loan guarantees meant to encourage lenders to loan money to students and their parents on favorable terms." *Chae v. SLM Corp.*, 593 F.3d 936, 938–39 (9th Cir. 2010). Under FFELP, students obtained loans from private lenders, but the loans were guaranteed by guaranty agencies, which in turn were reinsured by the federal government. *See, e.g.*, *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 640 (7th Cir. 2015).

By March 2006, Gentleman had paid off all of his loans except one, in the amount of $84,355.00. At that time, he received a document entitled "Federal Consolidation Loan Application and Promissory Note." The document offered to "drastically reduce" the interest on

---

[1] The defendants' motions seek dismissal of Gentleman's amended complaint. Nevertheless, for purposes of this opinion, the court refers to the pleading as the "complaint" for simplicity.

[2] The defendants move to dismiss principally under Federal Rule of Civil Procedure 12(b)(6). In considering a motion to dismiss under Rule 12(b)(6), the court must "view the complaint 'in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor.'" *Singer v. Progressive Care, SC*, 202 F. Supp. 3d 815, 825 (N.D. Ill. 2016) (quoting *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011)).

[3] With the passage of the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111–152, §§ 2201–2213, 124 Stat. 1029, 1074–81, Congress discontinued issuing new FFELP loans after June 30, 2010. *See* 20 U.S.C. § 1071(d); *Hunt v. Sallie Mae, Inc.*, No. 6:13-CV-00500-AA, 2014 WL 793075, at *2 (D. Or. Feb. 23, 2014).

his loan, which at the time was 6.25%. However, according to Gentleman, the document did not identify the original consolidating lender; it contained no information about the loan's maturity date or interest rate; and it provided no information about how penalties and other costs would be assessed in the event of a default. Am. Compl. ¶¶ 21-22. Nevertheless, Gentleman executed the documents (apparently, information was provided regarding where the documents should be sent), and between March 2006 and June 2010, he made payments on the loan amounting to $26,538.36.

In early 2010, for reasons not fully explained in the complaint, Gentleman "began to raise serious questions about who loaned him the money, what was the interest rate, how the interest rate was applied, the maturity date of the note and the amount owed because it was impossible to determine how payments were being applied." *Id*. ¶ 24. Gentleman raised these questions during numerous phone conferences with ACS, the loan servicer at the time, but ACS was unable or unwilling to answer his questions. Gentleman told ACS that he believed that the loan agreement was not enforceable and said that he would make no further payments until his questions about the loan were answered. The complaint alleges that ACS responded "with rude and threatening statements that if payments were not made that ACS or others would make negative reports to credit bureaus in an effort to destroy Gentleman's credit and that Gentleman would be sorry he failed to make payments." *Id*.

In June 2010, Gentleman stopped making payments, and in March 2011, he received a final notice from ACS stating that, based on an acceleration clause in the loan agreement, the full amount of the loan was now due. Gentleman continued to demand information about the loan, but to no avail. ACS again threatened that if he continued to refuse to make payment, it would destroy his reputation by reporting negative information about him to credit bureaus.

In September 2011, Gentleman began to receive communications from ASA (which would later be identified as the guarantor of the loan under FFELP, *id*. ¶ 38), demanding immediate payment of the loan balance. Gentleman's experience with ASA was much the same as his experience with ASC: he demanded information about the loan; refused to pay if the information was not forthcoming; and ASA rebuffed his requests and threatened to report him to the credit bureaus if he refused to pay.

ASA eventually referred the debt to collection agencies. In January 2012, Gentleman received a letter from Delta demanding that he pay $102,267.53 (the principal plus $2,240.94 in interest and $15,593.51 in fees). Later, in January 2014, Gentleman began receiving communications from GRS, which informed him that, due to the accrual of additional fees, he now owed $114,900.14. Throughout his dealings with Delta and GRS, Gentleman continued to demand information about the loan, but his questions went unanswered.

Gentleman claims that in addition to sending him written communications, ASA, GRS, and Delta also made repeated calls to his cell phone between 2013 and 2015. He alleges that he initially received calls on a daily basis, and that the calls eventually decreased to twice per month. According to the complaint, the callers refused to tell Gentleman the phone numbers they were calling from, and in some cases, the party on whose behalf they were calling. The calls persisted despite his repeated requests that the defendants stop calling.

The complaint alleges that in 2016, Gentleman contacted a mortgage broker because he was interested in purchasing real estate. At that time, Gentleman learned that his credit report indicated that he had defaulted on his school loan and that he owed both ASA and ACS $127,593.00. As a result, the broker informed Gentleman that he would not be able to "obtain an FHA loan or a loan with the lowest interest rates available." Am. Compl. ¶ 59. In addition,

Gentleman claims that his professional reputation was harmed by the fact that he had been "deemed not credit worthy." *Id*. ¶ 71.

Gentleman contends that the loan agreement is not legally enforceable against him, and asserts that this is why the defendants have refused to answer his questions about the loan. According to Gentleman, the defendants have entered into a conspiracy to collect the debt by harassing him with phone calls and making false reports to credit bureaus, despite their awareness that the loan is not legally enforceable. These allegations form the basis for six causes of action asserted in the complaint. Count I asserts a claim against all of the defendants seeking a declaratory judgment that the loan agreement is unenforceable; Count II asserts that the defendants violated the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 *et seq*.; Count III alleges a claim against all of the defendants for defamation under Illinois law; Count IV alleges that ASA, GRS, and Delta violated the Illinois Consumer Fraud and Deceptive Practices Act (ICFA), 815 ILCS 505/1 *et seq*.; Count V claims that ASA violated the Illinois Interest Act, 815 ILCS 205/1 *et seq*.; and Count VI charges ASA, GRS, and Delta with violating the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227.[4]

---

[4] The complaint also alleges a seventh count, which contains class action allegations. Gentleman does not affirmatively seek certification of a class. Rather, Count VII asserts that "Gentleman is believed to be a member of a class of persons who was [sic] placed in default and then negative credit reports were generated as a result of the default…. [and] a class of persons who was charged unlawful interest and penalties and part of a class of persons who were harassed by debt collectors." Am. Compl. ¶ 159. Gentleman goes on to say that he "seeks discovery before he attempts to certify a class of persons who were adversely affected by illegal and wrongful actions of ASA, Delta and [GRS]." *Id*. ¶ 162. GRS has moved to dismiss Count VII. Given that the count asserts no cause of action, however, the motion is denied on this score.

**DISCUSSION**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of a complaint, not its merits. *See, e.g.*, *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion, a complaint need only overcome what the Seventh Circuit has characterized as "two easy-to-clear hurdles." *E.E.O.C. v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th Cir. 2007). First, the complaint "must describe the claim in sufficient detail to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Id*. (quotation marks and ellipsis omitted). Second, the complaint's "allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Id*. (citation and quotation marks omitted).  The term "plausibility" "in this context does not imply that the district court should decide whose version to believe, or which version is more likely than not." *Swanson v. Citibank, N.A*., 614 F.3d 400, 404 (7th Cir. 2010). It means only that "the plaintiff must give enough details about the subject-matter of the case to present a story that holds together." *Id*.

**A.      Count I: Declaratory Judgment**

Count I of the complaint asserts a claim under the Declaratory Judgment Act. 28 U.S.C. § 2201(a), which provides that, "[i]n a case of actual controversy within its jurisdiction … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration." *Id*. Gentleman seeks a declaration that the promissory note he signed is not enforceable, and that ASA, ACS, GRS, and Delta have no right to enforce any obligation against him.

ACS, GRS, and Delta have separately moved to dismiss Count I for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).[5] Each asserts that the declaratory judgment claim fails because there is no "actual controversy" between itself and Gentleman. The Supreme Court has explained that in determining whether an actual controversy exists for purposes of the Declaratory Judgment Act, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quotation marks omitted).

GRS and Delta argue that there is no actual controversy between themselves and Gentleman because they are merely debt collectors and do not own the loan. Neither GRS nor Delta explains why there can be no actual controversy unless they are owners of the debt. Gentleman contends that GRS and Delta have an interest in the loan because they are entitled to

---

[5] The standard to be applied in deciding a Rule 12(b)(1) motion depends on the type of challenge the motion raises to subject-matter jurisdiction. *See, e.g.*, *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). A "facial challenge argues that the plaintiff has not sufficiently '*alleged* a basis of subject matter jurisdiction.'" *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (quoting *Apex Digital*, 572 F.3d at 443). "In reviewing a facial challenge, the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Id.* However, a "factual challenge lies where 'the complaint is formally sufficient but the contention is that there is *in fact* no subject matter jurisdiction.'" *Apex Digital*, 572 F.3d at 444 (quoting *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003)). "[W]hen considering a motion that launches a factual attack against jurisdiction, [t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.* (quotation marks omitted). Here, GRS's and Delta's Rule 12(b)(1) motions raise facial challenges to the court's jurisdiction. ACS's motion appears to assert a factual challenge because it cites (albeit minimal) evidence beyond the pleadings. However, the evidence submitted by ACS is unnecessary to decide the motion. Thus, in deciding the parties' Rule 12(b)(1) motions, the court employs the same standard as that used in Rule 12(b)(6) motions, taking the complaint's allegations as true and drawing all reasonable inferences in Gentleman's favor.

a percentage of any amounts collected. Am. Compl. ¶ 108. Thus, regardless of whether they own the loan, GRS's and Delta's interests are adverse to Gentleman's.

GRS additionally argues that the "actual controversy" requirement is not met here because any dispute between it and Gentleman lacks sufficient immediacy. According to GRS, this is because the complaint alleges that GRS took no action to collect the debt at any point after May, 2014. That is incorrect: Gentleman specifically alleges that GRS (as well as ASA and Delta) placed calls to his cell phone in an attempt to collect on the loan from late 2013 until late 2015. *See, e.g*., Am. Compl. ¶ 57.

Delta additionally argues that Count I fails because there is no private right of action under the Higher Education Act. As a result, Delta argues, "any purported failure by any entity to comply with any of the regulations set forth in Plaintiff's Complaint does not give rise to any claims by Plaintiff against any of the Defendants." Delta Mem. Supp. Mot. to Dismiss 4. This contention is wide of the mark: Gentleman does not argue that the promissory note should be declared unenforceable based on Delta's failure to comply with the HEA; he argues that the promissory note is unenforceable because, *inter alia*, the document is missing material terms and because Delta and the other defendants "cannot establish legal title or right to enforce" the note. Am. Compl. ¶ 103. The court concludes that Gentleman has sufficiently alleged an "actual controversy" between himself and both GRS and Delta. Their motions to dismiss are therefore denied as to Count I.

Matters are different in the case of ACS. Like GRS and Delta, ACS argues that there is no actual controversy between it and Gentleman because it does not own Gentleman's loan. However, in contrast to the complaint's allegations regarding GRS and Delta, Gentleman does not assert that ACS has an interest in the loan. In particular, Gentleman does not allege that ACS

is entitled to a percentage of any funds collected on the loan. In fact, the complaint appears to allege that ACS sold or assigned any rights it had to collect on the loan. *See* Am. Compl. ¶ 117 ("The continued false reports to companies that issue credit reports and the failure to remove such false reports by Education means that it is violating this Act each and every day since it sold or assigned its rights to any potential obligation owed by Gentleman."). Nor does Gentleman allege that ACS made any phone calls in an attempt to collect the debt. In fact, ACS is conspicuously absent from the key allegations on which Count I is based. Count I alleges that the promissory note is not enforceable because "ASA and Delta and [GRS] cannot prove it has [sic] standing to enforce any obligation"; "ASA and Delta and [GRS] cannot provide the chain of title or history of the ownership of any notes prior to the alleged assignment to ASA"; and because "ASA and Delta and [GRS] cannot establish that it [sic] has the legal title or right to enforce any obligation." *See* Am. Compl. ¶ 103.

In his response brief, Gentleman sums up his basis for naming ACS in Count I as follows:

> ACS admits that it is the "servicer of the Loan." Thus, ACS admits it is involved with collection of the Loan. If ACS is serving [sic] the Loan, it is an admission that it is doing something related to the Loan. The plaintiff is merely seeking a judgment declaring that he owes no monies and he wants the judgment to cover all parties who may have some interest in the outcome such as a party that admits it is a servicer of the loan. Accordingly, there is an actual controversy between the plaintiff and ACS.

Pl.'s Resp. ¶ 3.

As an initial matter, Gentleman is incorrect in asserting that ACS admits that it is the servicer of the loan or is currently involved in collecting the loan. On the contrary, ACS insists that it has had no involvement with the loan since Gentleman defaulted on it and it was transferred to ASA. *See* ACS Reply Br. 6 n.1. In any event, even assuming ACS is "doing

something related to the loan," that would not be enough to meet the actual controversy requirement. Hence, Gentleman fails to allege an actual controversy between himself and ACS.

As to Count I, therefore, ACS's motion to dismiss is granted.

## B.     The Fair Debt Collection Practices Act

Count II of Gentleman's complaint asserts a claim under the Fair Debt Collection Practices Act (FDCPA). "The purposes of the FDCPA are 'to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.'" *Pantoja v. Portfolio Recovery Assocs., LLC*, 852 F.3d 679, 683 (7th Cir. 2017) (quoting 15 U.S.C. § 1692(e)). Gentleman alleges that the defendants violated the FDCPA in numerous ways—including providing false information about him to credit agencies, and by failing to provide him with information required by the statute. *See* Am. Compl. ¶ 112. In addition, Gentleman argues that the defendants formed a conspiracy to violate the FDCPA by seeking to collect on Gentleman's loan even though they knew, or should have known, that they had no right to do so. As a result, Gentleman maintains, each of the defendants is liable for the others' actions in connection with the conspiracy. The defendants have moved to dismiss the claim on various grounds.

## ASA

ASA moves to dismiss Count II based on a provision of the FDCPA that exempts from the statute's definition of "debt collector" "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity … is incidental to a bona fide fiduciary obligation." 15 U.S.C. § 1692a(6)(F)(i). ASA contends that it stands in a fiduciary relationship to the Department of Education by virtue of its role as a loan

guarantor under the FFELP Program. As a result, ASA asserts that its attempts to collect on Gentleman's loan are "incidental to a bona fide fiduciary obligation" as mentioned in § 1692a(6)(F)(i). It follows, ASA argues, that it is not a "debt collector" for purposes of the FDCPA; and since the FDCPA applies only to debt collectors, ASA argues that it is exempt from liability under the act.

There is ample case authority to support ASA's assertion that guaranty agencies under the FFELP Program have a fiduciary relationship with the Department of Education and thus are not subject to liability under the FDCPA. *See, e.g.*, *Seo v. Educ. Credit Mgmt. Corp.*, No. 15-CV-3703, 2016 WL 521065, at *2 (N.D. Ill. Feb. 9, 2016). However, Gentleman raises a factual challenge to ASA's representations regarding its fiduciary status. Specifically, Gentleman alleges that ASA has one or more "mysterious sister companies" that have names very similar to ASA's and that have the same address and the same corporate officers. Am. Compl. ¶ 12. He claims to have found a company called "American Student Assistance Services, Inc.," which has the same address, same president, and same treasurer as ASA. *Id*. Gentleman goes on to allege "[u]pon information and belief, [that] ASA is not really a non [sic] for profit and/or does not act in a manner that establishes that it should be treated as a non [sic] for profit or should be protected from violations of the [FDCPA]." *Id*. ¶ 146.

At this stage, the court is required to accept the complaint's allegations as true and to draw all reasonable inferences in Gentleman's favor. *See, e.g.*, *Singer v. Progressive Care, SC*, 202 F. Supp. 3d 815, 825 (N.D. Ill. 2016) (quoting *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011)). If Gentleman's allegations are true, it is unclear whether ASA indeed comes within the exclusion from debt collector status under § 1692a(6)(F)(i). ASA may raise this

issue again after the factual record in the case has been developed. At this stage, however, the court denies ASA's motion to dismiss Count II.

**ACS**

Like ASA, ACS seeks to dismiss Count II on the ground that it is not a "debt collector" within the meaning of the FDCPA. However, ACS relies upon a separate provision of the statute that excludes from the definition of "debt collector" "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity … concerns a *debt which was not in default at the time it was obtained by such person*." 15 U.S.C. § 1692a(6)(F)(iii) (emphasis added). As the Seventh Circuit has explained, "[t]he reason that Congress excluded as potential defendants under the FDCPA persons who acquire debts before a debtor defaults is that those persons have an incentive to promote a positive relationship with the debtor and are less likely to harass, even if the debtor later defaults." *Johnson v. Carrington Mortg. Servs.*, 638 F. App'x 523, 525 (7th Cir. 2016); *see also Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7th Cir. 2003) (discussing policy reasons for §1692a(6)(F)(iii)).

ACS contends that it began to service Gentleman's loan before it was in default, and that, as a result, it is exempt from liability under the FDCPA. Gentleman does not dispute that ACS began servicing the loan prior to the default. He asserts that ACS made attempts to collect the debt after the loan went into default. For purposes of §1692a(6)(F)(iii), however, the relevant question is the loan's status when ACS began servicing the loan. *See, e.g.*, *Johnson*, 638 F. App'x at 524 ("[Plaintiff's FDCPA] claims fail if Carrington was not a 'debt collector,' and it was not a debt collector if Johnson 'was not in default at the time [the debt] was obtained by' Carrington.") (quoting 15 U.S.C. §1692a(6)(F)(iii)). Based on the amended complaint's own

allegations, therefore, ACS is not a "debt collector" within the meaning of the FDCPA. Accordingly, the court grants ACS's motion to dismiss Count II.

**GRS & Delta**

GRS and Delta both argue that Count II is barred by the FDCPA's one-year statute of limitations. *See* 15 U.S.C. § 1692k(d) ("An action to enforce any liability created by this subchapter may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, within one year from the date on which the violation occurs."). Since Gentleman filed the instant suit on March 13, 2016, only violations alleged to have occurred after March 13, 2015 are actionable. According to GRS and Delta, they are not alleged to have committed any violations of the FDCPA after 2014.

This is incorrect. Gentleman's complaint specifically alleges that GRS and Delta violated the FDCPA by making calls to his cell phone until late 2015. *See* Am. Compl. ¶ 57 ("In approximately late 2013 and early 2014 Gentleman was bombarded with telephone calls on his cell phone in an effort to collect the student loan. These phone calls continued from early 2014 until late 2015. At first, there were calls virtually every day but then decreased to at least 2 per month. The callers identified themselves to Gentleman as representatives from ASA, Delta, [GRS] and others.").

Nevertheless, GRS and Delta are correct in asserting that many of the FDCPA violations alleged in the complaint took place prior to March 13, 2015. Gentleman argues that the defendants may be held liable for these violations based on his claim that they engaged in a conspiracy to violate his rights under the FDCPA. *See* Am. Compl. ¶ 115 ("Thus for statute of limitations purposes Delta and [GRS] committed wrongful actions that began in 2012 and they both committed wrongful and illegal actions that violated the Act in 2016. In fact, to this day

there are liable for violating the Act because they are still involved in efforts to collect the debt, are still involved in the conspiracy and have not in any way shape or form have withdrawn or repudiated the conspiracy."). However, the Seventh Circuit has squarely held that "a plaintiff cannot use a theory of a continuing civil conspiracy to recover for individual overt acts that would themselves be time-barred." *Rosado v. Gonzalez*, 832 F.3d 714, 718 (7th Cir. 2016); *Scherer v. Balkema*, 840 F.2d 437, 440 (7th Cir. 1988) ("A rule allowing plaintiffs in civil conspiracy actions to recover only for overt acts alleged to have occurred within the applicable limitations period makes sense…. [C]haracterizing the defendants' separate wrongful acts as having been committed in furtherance of a 'continuing' conspiracy should not postpone accrual of damage claims based on individual wrongful acts.").[6] Thus, any alleged violations based on conduct occurring outside of the FDCPA's limitations period are foreclosed.

As to Count II, therefore, the court: denies ASA's motion to dismiss; denies GRS's and Delta's motions to dismiss with respect to any FDCPA violations occurring after March 13, 2015; grants GRS's and Delta's motions to dismiss with respect to any putative violations taking place prior to March 13, 2015; and grants ACS's motion to dismiss.[7]

---

[6] Although not raised by the parties, the court additionally notes that the continuing-violation doctrine does not apply to FDCPA claims, *see, e.g.*, *Judy v. Blatt, Hasenmiller, Leibsker & Moore LLC*, No. 09 C 1226, 2010 WL 431484, at *3 (N.D. Ill. Jan. 29, 2010).

[7] Gentleman argues that even if ACS is not a "debt collector" within the meaning of the FDCPA and thus cannot be held directly liable for violating the act, ACS may nonetheless be held liable for other defendants' violations by virtue of having conspired with them to violate the FDCPA. Gentleman cites no authority for the proposition that a party that cannot be liable for violating a statute can be liable for conspiring to violate that statute. The case on which Gentleman relies, *Bible v. United Student Aid Funds, Inc*., 799 F.3d 633 (7th Cir. 2015), is inapposite. There, the plaintiff asserted a RICO claim alleging that a FFELP guaranty agency, debt collector, and loan servicers, had committed mail fraud and wire fraud by assessing collection costs against her despite telling her that she owned nothing on her loan. *Id*. at 638. The guaranty agency argued that the RICO claim failed because there was no private right of action under the HEA. The court rejected the argument, noting that the plaintiff's RICO claim was not based on the defendant's

**C.      Defamation**

Count III alleges a common-law defamation claim against all of the defendants. "To prove a defamation claim, the evidence must show that a defendant made a false statement concerning the plaintiff, that there was an unprivileged publication of the defamatory statement to a third party by the defendant, and that the plaintiff suffered damages as a result." *Giant Screen Sports v. Canadian Imperial Bank of Commerce*, 553 F.3d 527, 532 (7th Cir. 2009) (citing *Seith v. Chicago Sun–Times, Inc.*, 861 N.E.2d 1117, 1126 (Ill. App. Ct. 2007)). "An Illinois defamation action may state a claim either for defamation per se (statements so harmful to reputation that damages are presumed) or defamation per quod (statements requiring extrinsic facts to show their defamatory meaning." *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003). Gentleman alleges claims for both defamation per se and defamation per quod.

The defendants first argue that Gentleman's defamation claim is preempted by the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq*. They correctly observe that the FCRA contains provisions that specifically preempt claims for defamation, invasion of privacy, and similar causes of action arising under state law. *See* 15 U.S.C. §§1681h(e) ("[N]o consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any … person who furnishes information to a consumer reporting agency."); *see also id.* § 1681t(b)(1)(F) ("No requirement or prohibition may be imposed under the laws of any State… with respect to any subject matter regulated under…

---

failure to comply with the HEA. *Id.* at 660. In any case, the question at issue in *Bible* was whether the defendant could be liable under RICO, despite the fact that there was no private right of action against the defendant under a different statute. Here, it is not merely that there is no private right of action against ACS; it is that ACS is exempt from liability under the FDCPA altogether.

section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies.").

In response, however, Gentleman argues that these provisions bar only claims based on statements made to credit agencies. He contends that his defamation claim is based in part on the defendants' statements to third parties. *See* Am. Compl. ¶ 122 ("ASA, Education, [GRS] and Delta defamed Gentleman by making false statements to third parties which include but are not limited to credit agencies that they knew or should have known were false."). Thus, at least insofar as his defamation claims are based on statements to third parties, he argues that the claims are not preempted. The parties have not cited any case authority specifically addressing this question, and the court has found none. It is unnecessary to resolve the issue, however, because the defendants have asserted other grounds on which the claims must be dismissed.

First, defendants argue that Gentleman's claim for defamation per se fails because the statements on which it is based do not qualify as defamatory per se. Under Illinois law, a statement is defamatory per se only if it falls into one of five categories: "(1) commission of a criminal offense; (2) infection with a venereal disease; (3) inability to perform or want of integrity in the discharge of duties of public office; (4) fornication or adultery; or (5) words that prejudice a party in her trade, profession, or business." *Muzikowski*, 322 F.3d at 924. Gentleman alleges that the defendants' "statements were defamatory per se because they involve and affect the professional reputation of Gentleman and impute the commission of violations of the law by violating federal statutes pertaining to student loans." Am. Compl. ¶ 129. This allegation does not implicate any of the five pertinent categories. Only the first and last of the categories are potentially relevant; but neither is ultimately applicable. Although Gentleman claims that the defendants' statements indicated that he had violated federal statutes, he does not allege that the

defendants accused him of committing a criminal offense. Nor does Gentleman allege that the defendants made statements likely to "prejudice a party in her trade, profession, or business." He does not allege that the statements "prejudiced" him, only that the statements "involve[ed]" and affect[ed]" his professional reputation. In addition, Gentleman has cited no case in which statements regarding a party's indebtedness have been found defamatory per se. Indeed, case authority is to the contrary. *See, e.g.*, *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610 (7th Cir. 2013) (false statements that former basketball star was bankrupt were not defamatory per se).

Gentleman's claim for defamation *per quod* fails as well. To state a claim for defamation *per quod*, a plaintiff must allege that he has suffered special damages. Such allegations are subject to the heightened pleading requirement of Federal Rule of Civil Procedure 9(g). *See* Fed. R. Civ. P. 9(g) ("If an item of special damage is claimed, it must be specifically stated."). Although not as demanding as Rule 9(b)'s particularity requirement, *see, e.g.*, *Pippen*, 734 F.3d at 614, courts have consistently held that Rule 9(g) requires that special damages be itemized in some fashion, *see, e.g.*, *Muzikowski*, 322 F.3d at 927 ("[Plaintiff concedes in his reply brief that he did not itemize his losses or plead specific damages of actual financial injury. This is a required element of a per quod claim."). In *Pippen*, for example, the court found that the plaintiff's allegations of special damages were sufficient because he "itemized losses that in his view flowed from defendants' statements; he identified specific business opportunities that had been available to him earlier but that, following the defendants' statements, were available no more. This is more than a general allegation of economic loss; it is an allegation that third parties have ceased to do business with him because of the defendants' actions." *Pippen*, 734 F.3d at 614.

Gentleman's sole allegation on this score is as follows: "As a direct and proximate result of the defamation, Gentleman suffered damage including but not limited to: his good professional and personal reputation was damaged, his credit rating was adversely affected, he was unable to obtain credit, he was unable to obtain a loan and obtained a loan with a higher interest rate than he should have been charged." Am. Compl. ¶ 131. Gentleman provides no specific information about how his reputation was harmed. (He identifies no lost business opportunities, for example). He also provides no specific information regarding the instances in which he was unable to obtain credit or was forced to obtain a loan at an inordinately high interest rate. Gentleman alleges that when he tried to obtain a loan to purchase real estate in 2016, he was told that he could not "obtain an FHA loan or a loan with the lowest interest rates available based upon the fact that he was in default on a student loan." Am. Compl. ¶ 59. But he does not state whether he ever obtained the loan, what interest rate he was charged, and to what extent the interest rate exceeded the rate he would have been charged but for defendants' alleged defamatory statements. Nor does the complaint indicate whether there were other instances in which Gentleman was denied credit or was forced to take loans with unusually high interest rates. The court concludes that Gentleman's complaint fails to meet Rule 9(g)'s requirements. Consequently, his defamation per quod claim fails.

In sum, because the statements alleged by Gentleman were not defamatory per se, and because he has failed sufficiently to allege special damages, the court grants all of the defendants' motions to dismiss Count III of the complaint.

**D.      Illinois Consumer Fraud and Deceptive Practices Act**

In Count IV, Gentleman asserts a claim under the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA"). "The ICFA prohibits 'unfair or deceptive acts or practices, including ...

fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact' in the 'conduct of any trade or commerce.'" *Sabrina Roppo v. Travelers Commercial Ins. Co.*, No. 15-3171, 2017 WL 3695205, at *17 (7th Cir. Aug. 28, 2017) (quoting 815 Ill. Comp. Stat. 505/2). Gentleman claims that ASA, Delta, and GRS violated the ICFA by making "false statements and act[ing] in a deceptive manner by trying to collect a debt that they knew or should have known was not owed." Am. Compl. ¶ 134.

## ASA

ASA first argues that Gentleman's ICFA claim is preempted by the Higher Education Act. ASA asserts that the ICFA claim is based in part upon ASA's alleged refusal to provide Gentleman with information (e.g., "a chain of title") pertaining to the loan. ASA further points out that the Higher Education Act specifically exempts FFELP loans from state-law disclosure requirements. *See* 20 U.S.C. § 1098g ("Loans made, insured, or guaranteed pursuant to a program authorized by Title IV of the Higher Education Act of 1965 shall not be subject to any disclosure requirements of any State law.") (citation omitted). As noted above, however, Count IV is based not on ASA's refusal to make disclosures, but on its alleged attempt to collect a debt that it knew, or should have known, Gentleman did not owe. Accordingly, ASA's preemption argument fails.

However, as a second basis for dismissal, ASA argues that Gentleman's ICFA claim is untimely. "Generally, an ICFA claim must be brought within three years of the date the claim accrues." *Blankenship v. Pushpin Holdings, LLC*, 157 F. Supp. 3d 788, 792 (N.D. Ill. 2016) (quotation marks omitted). "An ICFA claim accrues when the plaintiff knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused." *Id.* (quotation marks omitted). ASA argues that Gentleman's ICFA claim accrued in

2012—when his loan went into default and the collection costs were assessed against him—but that he did not file suit until 2016. Gentleman has not responded to this argument. Accordingly, it is deemed waived. *See, e.g.*, *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("[The Bontes'] silence leaves us to conclude … that the Bontes concede that the charges identified in their complaint are not "material" disclosures that would warrant rescission under TILA. Failure to respond to an argument—as the Bontes have done here—results in waiver."); *Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999) ("It is not the responsibility of this court to make arguments for the parties."). Thus, ASA's motion to dismiss Count IV is granted.

**GRS & Delta**

GRS & Delta first argue that the ICFA claim fails because Gentleman has not alleged that he suffered actual damages as a result of their alleged conduct. They point out that actual damages under the ICFA are pecuniary or economic in nature. *See, e.g.*, *Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010) ("The actual damage element of a private ICFA action requires that the plaintiff suffer 'actual pecuniary loss.'") (quoting *Mulligan v. QVC, Inc.*, 888 N.E.2d 1190, 1197 (Ill. App. Ct. 2008)). This argument fails. The harm alleged in connection with Gentleman's ICFA claim is the same as that alleged in support of his defamation claim: "his good professional and personal reputation was damaged, his credit rating was adversely affected, he was unable to obtain a loan and obtained a loan with a higher interest rate than he should have been charged." Am. Compl. ¶ 135. Putting aside whether Gentleman's reputational harm may constitute actual damages for purposes of the ICFA, the court concludes that having to pay higher interest qualifies.

However, GRS and Delta additionally argue that Gentleman has failed to allege proximate causation—i.e., that he was deceived by them or relied on their deceptive statements

or actions. *See, e.g.*, *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513–14 (7th Cir. 2006) ("[A] damages claim under the ICFA requires that the plaintiff was deceived in some manner and damaged by the deception."). On this point, they are correct. Gentleman's complaint does not allege that he was deceived by, or relied upon, anything GRS or Delta said or did. On the contrary, the complaint emphasizes that Gentleman refused to make any payments on the loan despite GRS's and Delta's persistent collection efforts. In response to GRS's and Delta's argument, Gentleman further asserts that he "was deceived by paying monies that he did not have to pay" and that he "wrote countless letters to various parties about this dispute but none of the defendants, even to this day, could tell plaintiff what was owed and how it was calculated." Pl.'s Resp. ¶ 23. But the payments in question ended in 2010—well before Delta and GRS entered the picture (2012 and 2014, respectively). Thus, Gentleman cannot plausibly maintain that this deception was related to any actions or statements by Delta and GRS.

Accordingly, Count IV is dismissed as to ASA, GRS, and Delta.

**E.      The Illinois Interest Act**

Count V alleges that ASA violated section 6 of the Illinois Interest Act, 815 ILCS 205/6, which prohibits the charging or receiving of unlawful interest in connection with any loan. The complaint alleges that ASA violated the Interest Act because it "has tried to collect interest that is illegal from Gentleman by attempting to collect interest that is not owed and by charging interest at a rate of 6.25% per day." Am. Compl. ¶ 138.

ASA argues that this claim is preempted by a provision of the Higher Education Act stating: "No provision of any law of the United States … or of any State (other than a statute applicable principally to such State's student loan insurance program) which limits the rate or

amount of interest payable on loans shall apply to a loan … which is insured … by the United States … [or] by a guaranty agency under [the FFELP Program]." 20 U.S.C. § 1078(d)(2).

This argument fails for two reasons. First, the argument has not been sufficiently developed. It consists of only a few conclusory assertions at the very end of ASA's brief. *See* ASA Mot. to Dismiss 12. ASA merely paraphrases § 1078(d)(2) and asserts that Count V is preempted. It is well-settled that undeveloped and perfunctory arguments are forfeited. *See, e.g.*, *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc*., 845 F.3d 313, 321 (7th Cir. 2017).

Second, ASA's argument (to the extent that the court is able to decipher it) appears to misapprehend the Illinois Interest Act and the gravamen of the argument Gentleman asserts under it. In particular, ASA apparently understands Gentleman to be arguing that the interest rate on his loan is impermissible because it exceeds some statutory limit imposed by the Interest Act. But, as another court has observed, "the Interest Act imposes no restriction on either the 'rate' or the 'amount' of interest the borrower may be charged, but merely requires that any interest rate or amount agreed to by the parties cannot be charged after the borrower is no longer indebted. The Illinois Interest Act leaves entirely to the parties the rate and amount of interest to be exacted." *Larsen v. Countrywide Home Loans, Inc*., No. 01 C 2233, 2001 WL 803689, at *2 (N.D. Ill. July 17, 2001). As Gentleman explains in his response, he does not maintain that the Interest Act places a cap on the amount of interest that ASA may charge. Rather, he argues that ASA has violated the Act because the consolidation documents he received in 2006 promised to drastically reduce the interest rate on his loan but failed to do so. According to Gentleman, the interest rate applied to his post-consolidation loan, 6.25%, was the same as that for his pre-consolidation loan.

For these reasons, the court denies ASA's motion to dismiss Count V of Gentleman's amended complaint.

## F.    The Telephone Consumer Protection Act[8]

Count VI of the complaint alleges a claim under the Telephone Consumer Protection Act (TCPA). The TCPA "prohibits making 'any call' without the prior express consent of the recipient 'using any automated telephone dialing system' [ATDS] … to 'any telephone number assigned to a paging service [or] cellular telephone service.'" *Blow v. Bijora*, *Inc*., 855 F.3d 793, 798 (7th Cir. 2017) (quoting 47 U.S.C. § 227(b)(1)(A)(iii)). Gentleman claims that ASA, GRS, and Delta violated the TCPA by calling him via an ATDS without his consent. Only GRS and Delta have moved to dismiss the TCPA claim. They argue that the claim is barred by an amendment to the act made in 2015. They also argue that Count VI suffers from pleading defects. Neither argument is convincing.

**The Bipartisan Budget Act of 2015**

In 2015, Congress passed the Bipartisan Budget Act of 2015. Pub. L. No. 114-74, 129 Stat. 584 (2015). Among other things, the legislation amended the TCPA to make the act inapplicable to calls "made solely to collect on a debt owed to or guaranteed by the United States." *Id*. § 301. The defendants point out that the loan in question here was issued in accordance with the FFELP Program and was therefore guaranteed by the federal government. As a result, they maintain that their calls to Gentleman were made solely to collect a "debt owed to or guaranteed by the United States," and are exempt from the TCPA.

---

[8] As with his claims under the FDCPA, Gentleman alleges that GRS and Delta are liable both for directly violating the TCPA and for conspiring to violate the act. Since neither GRS nor Delta has specifically addressed Gentleman's conspiracy claim as it relates to Count VI, the court does not address it here.

For his part, Gentleman concedes that the loan is a "debt owed to or guaranteed by the United States." However, he argues that the amendment does not apply to his claims because the calls on which they are based took place before the amendment was enacted. Whether Gentleman's TCPA claim survives therefore turns on whether the 2015 amendment applies retroactively. The court concludes that it does not.

The Supreme Court has "frequently noted … that there is a presumption against retroactive legislation [that] is deeply rooted in our jurisprudence." *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 946 (1997) (quotation marks omitted); *see also Vartelas v. Holder*, 566 U.S. 257, 266 (2012) ("The presumption against retroactive legislation … embodies a legal doctrine centuries older than our Republic.") (quotation marks omitted). Accordingly, courts are to "apply this time-honored presumption unless Congress has clearly manifested its intent to the contrary." *Id*. In *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), the Court established a two-step inquiry for determining whether a statute should be applied retroactively. First, a court must ask "whether Congress expressed clear intent for retroactive application." *Jeudy v. Holder*, 768 F.3d 595, 600 (7th Cir. 2014). If Congress has not expressed such an intent, the court must consider "whether the statute would have an impermissible retroactive effect in the given case." *Id*. A law is deemed to have such an effect when, for example, "it 'would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'" *Durable Mfg. Co. v. U.S. Dep't of Labor*, 578 F.3d 497, 503 (7th Cir. 2009) (quoting *Landgraf*, 511 U.S. 244 at 280). "The inquiry into whether a statute operates retroactively demands a commonsense, functional judgment about 'whether the new provision attaches new legal consequences to events completed before its enactment.' This judgment should be informed and guided by 'familiar considerations of fair

notice, reasonable reliance, and settled expectations.'" *Martin v. Hadix*, 527 U.S. 343, 357–58 (1999) (quoting *Landgraf*, 511 U.S. 244, 270 (1994)). "The essential inquiry," the Court has instructed, "is whether the new provision attaches new legal consequences to events completed before its enactment." *Vartelas*, 566 U.S. at 273.

Congress has expressed no clear intent that the 2015 amendment should be applied retroactively. Thus, the court must consider whether the application of the amendment would have an impermissible retroactive effect. So far, only two courts have addressed this question and they have reached different conclusions. *Compare Silver v. Pa. Higher Educ. Assistance Agency*, No. 14-CV-0652-PJH, 2016 WL 1258629 (N.D. Cal. Mar. 31, 2016) (applying the amendment retroactively to bar TCPA claims), *with Woods v. Santander Consumer USA Inc*., No. 2:14-CV-02104-MHH, 2017 WL 1178003, at *3 (N.D. Ala. Mar. 30, 2017) (declining to apply the amendment retroactively). In *Silver*, the court applied *Landgraf* and asked whether retroactive application of the amendment "'would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'" *Id*. at *3 (quoting *Landgraf*, 511 U.S. at 280). Concluding that "none of these three conditions [was] met," the court held that the amendment applied retroactively and barred the plaintiff's TCPA claims. *Id*.

The court respectfully disagrees with *Silver*'s reasoning. The conditions mentioned by the *Silver* court—impairing rights a party possessed when he acted; increasing a party's liability for past conduct; imposing new duties with respect to transactions already completed—are often cited as paradigmatic examples of impermissible retroactive effects. But the Supreme Court has never held that these are the only considerations relevant to the retroactivity inquiry. On the contrary, the Court has expressly disavowed such a view. *See Hughes Aircraft Co. v. U.S. ex rel.*

*Schumer*, 520 U.S. 939, 947 (1997) ("To the extent respondent contends that only statutes with one of these effects are subject to our presumption against retroactivity, he simply misreads our opinion in *Landgraf*. The language upon which he relies does not purport to define the outer limit of impermissible retroactivity. Rather, our opinion in *Landgraf* … merely described that any such effect constituted a sufficient, rather than a necessary, condition for invoking the presumption against retroactivity. Indeed, we recognized that the Court has used various formulations to describe the functional conceptio[n] of legislative retroactivity.") (quotation marks omitted).  Rather, as noted above, "[t]he essential inquiry … is whether the new provision attaches new legal consequences to events completed before its enactment." *Vartelas*, 566 U.S. at 273.

Applying the 2015 amendment here would have the effect of extinguishing Gentleman's claim. In many cases, courts have declined to apply legislation retroactively where doing so would foreclose a cause of action that otherwise would have been available. *See, e.g.*, *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1187–88 (9th Cir. 2016) (holding that amendment to Interstate Land Sales Full Disclosure Act [ILSA] "would have retroactive effect because it would extinguish Defendants' liability under ILSA, and by extension [California's Unfair Competition Law], thus depriving Plaintiffs of a pre-existing cause of action"); *Bonner v. Home123 Corp*., No. 2:05-CV-146 PS, 2006 WL 1518974, at *7 (N.D. Ind. May 25, 2006) (amendment to the FRCA did not apply to pre-amendment violations because to do so would extinguish the "right to bring a specific cause of action and the right to seek certain damages for such an action, which Plaintiffs possessed when they received the allegedly improper solicitations").

GRS and Delta rest entirely on *Silver* and make no attempt to address cases such as *Beaver* and *Bonner*. Nor do they address the FCC's regulations for implementing the 2015

amendment, which were issued on August 11, 2016. *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 31 F.C.C. Rcd. 9074 (2016). The regulations curtail the amendment's broad exemption from liability under the TCPA by placing limits on the number of federal debt collection calls that may be made per month, *id*. ¶ 33, the content and length of the calls, *id*. ¶¶ 43, 46, and the time of day at which the calls could be made, *id*.¶ 42. Nothing in the FCC's regulations suggests that the 2015 amendment should be applied retroactively. Nor have the defendants addressed whether the regulations themselves are to be applied retroactively. If the regulations in fact apply retroactively, it is possible that they have been violated by the defendants, in which case Gentleman's TCPA claim would remain viable.

Under these circumstances, the defendants have not persuaded the court that the 2015 amendment to the Bipartisan Budget Act should be applied retroactively to bar Gentleman's TCPA claim.

**Pleading**

As an alternative basis for Count VI's dismissal, GRS and Delta argue that Gentleman's TCPA claim has not been sufficiently pleaded. They generally contend that Gentleman's allegations in support of his TCPA claim are conclusory. They argue more particularly that Gentleman has provided no basis for asserting that the defendants' phone calls to him were made using an ATDS.

The court disagrees. The complaint provides sufficient factual detail regarding the nature and timing of the calls. Gentleman alleges that the calls began "[i]n approximately late 2013 and early 2014," and that they continued "until late 2015." Am. Compl. ¶ 57. He alleges that the callers identified themselves as representatives from ASA, GRS, Delta, and others. *Id*. In some cases, he lists specific dates on which the calls were received, as well as the specific telephone

numbers from which they were made. In particular, the court finds nothing deficient in Gentleman's allegations regarding the defendants' use of ATDSs. Despite the defendants' contentions to the contrary, Gentleman's allegations on this score are not conclusory. He provides a specific factual basis for believing that the calls were made using an ATDS, explaining that when he asked callers to tell him the phone numbers they were calling from, they told him that they were unable to do so because they were calling from an ATDS. *Id*. ¶ 57.

In short, the court is not persuaded by the defendants' contention that Gentleman's TCPA claim is foreclosed by the Bipartisan Budget Act of 2015, or their contention that the claim is inadequately pleaded. The court therefore denies GRS's and Delta's motions to dismiss Count VI.

## CONCLUSION

For the reasons discussed above, ASA's motion to dismiss is granted as to Counts III and IV and denied as to Counts II and V. GRS's and Delta's motions to dismiss are granted as to Counts III and IV; denied as to Counts I and VI; and granted as to Count II insofar as it alleges violations of the FDCPA occurring before March 13, 2015 and denied as to violations occurring after that date. ACS's motion to dismiss is granted as to Counts I, II, and III (the only counts in which it has been named as a defendant). If Gentleman wishes to replead any of his claims, he may seek leave to do so, and the court will determine at that time whether further amendment of the complaint will be permitted.


Date:   September 21, 2017                       _____/s/_____
                                                  Joan B. Gottschall
                                                  United States District Judge